MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
MAYA SORENSEN (State Bar No. 250722)
TERESA ALLEN (State Bar No. 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California 94612
Telephone: (510) 452-5500
Facsimile: (510) 452-5510

Attorneys for Plaintiff
Ana Lorena Rodas

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MARLON JOEL RODAS-SÁNCHEZ,
Deceased, through his successor in interest
ANA LORENA RODAS; ANA LORENA
RODAS, individually,

              Plaintiff,

vs.

CITY OF SALINAS, a public entity;
CITY OF SALINAS POLICE CHIEF
ADELE FRESÉ; SALINAS POLICE
OFFICERS GUADALUPE GONZÁLEZ;
CAMERON MITCHELL; JARED
DOMINICI; MANUEL LÓPEZ, JR.;
ISIDORO MEDRANO; SERGEANT
DANNY WARNER; and DOES 1–20,
individually, jointly and severally,

              Defendants.

No:

**COMPLAINT FOR DAMAGES,
DECLARATORY AND INJUNCTIVE
RELIEF, AND DEMAND FOR JURY
TRIAL**

COMPLAINT AND JURY DEMAND

Plaintiff, by and through her attorneys, HADDAD & SHERWIN LLP, for her Complaint against Defendants, states as follows:

## JURISDICTION

1.     This is a civil rights, wrongful death, and survival action arising from Defendants' wrongful use of recklessly provocative tactics and uses of force—including blasts from a high-pressure firehose; 40 mm "less-lethal" baton rounds; Taser deployments; and deadly force, including multiple gunshots from an AR-15 assault rifle and a .45 semi-automatic pistol—resulting in the death of sixteen-year-old MARLON RODAS-SANCHEZ, Deceased, on or about January 18, 2017, in the City of Salinas, Monterey County, California.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988; and the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as the laws and Constitution of the State of California, including but not limited to California Civil Code §§ 52.1 and 52, and California common law.  Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.  Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under state law.

## INTRADISTRICT ASSIGNMENT

2.     A substantial part of the events and/or omissions complained of herein occurred in Monterey County, California, and pursuant to Northern District Civil Local Rule 3-2(d), this action is properly assigned to the San Jose Division of the United States District Court for the Northern District of California.

## PARTIES AND PROCEDURE

3.     Plaintiff ANA LORENA RODAS is the mother of MARLON RODAS-SÁNCHEZ and a resident of the State of California.  Plaintiff ANA LORENA RODAS brings these claims individually for wrongful death and violation of her personal rights, and as successor in interest for Decedent MARLON RODAS-SÁNCHEZ, asserting survival claims for MARLON RODAS-SÁNCHEZ.  She brings these claims under state and federal law, and pursuant to California Code of Civil Procedure §§ 377.20 *et seq.* and 377.60 *et seq.*, which provide for survival and wrongful

death actions. Both the wrongful death and survival claims survive the death of MARLON RODAS-SÁNCHEZ; both arise from the same wrongful act or neglect of another; and such claims are properly joined pursuant to California Code of Civil Procedure § 377.62. Plaintiff also brings her claims on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal civil rights law. Plaintiff also brings these claims as a Private Attorney General, to vindicate not only her rights, but others' civil rights of great importance.

4.      Defendant CITY OF SALINAS is a public entity established by the laws and Constitution of the State of California, and owns, operates, manages, directs, and controls the Salinas Police Department (SPD) which employs other defendants in this action.

5.      Defendant Chief of Police of the SPD, ADELE FRESÉ, at all material times was employed as Chief of Police of the SPD by Defendant CITY OF SALINAS, and she was acting within the course and scope of that employment. As Chief of Police of the SPD, Defendant FRESÉ was a policy-making official for Defendant CITY OF SALINAS with the power to make official and final policy for the SPD. Defendant FRESÉ is being sued in her individual capacity.

6.      Defendant GUADALUPE GONZÁLEZ at all material times was employed as a police officer by Defendant CITY OF SALINAS, and she was acting within the course and scope of that employment. Defendant GONZÁLEZ, at the time of the incident, was a relatively new SPD officer, having been hired in 2016.

7.      Defendant CAMERON MITCHELL at all material times was employed as a police officer by Defendant CITY OF SALINAS, and he was acting within the course and scope of that employment. Defendant MITCHELL, at the time of the incident, was a relatively new SPD officer, having been hired in 2016.

8.      Defendant JARED DOMINICI at all material times was employed as a police officer by Defendant CITY OF SALINAS, and he was acting within the course and scope of that employment. Defendant DOMINICI, at the time of the incident, was a relatively new SPD officer, having been hired in 2013.

9.      Defendant MANUEL LÓPEZ, JR. at all material times was employed as a police officer by Defendant CITY OF SALINAS, and he was acting within the course and scope of that employment.  Defendant LÓPEZ, at the time of the incident, had 9 years of experience as an SPD officer.

10.     Defendant ISIDORO MEDRANO at all material times was employed as a police officer by Defendant CITY OF SALINAS, and he was acting within the course and scope of that employment.  Defendant MEDRANO, at the time of the incident, was a relatively new SPD officer, having been hired in 2016.

11.     Defendant SERGEANT DANNY WARNER at all material times was employed as a police officer by Defendant CITY OF SALINAS, and he was acting within the course and scope of that employment.  On information and belief, Defendant WARNER, at the time of the incident, had about 15 years of experience as an SPD officer.  Defendant WARNER supervised all SPD officers, including Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, throughout this incident, and personally authorized and/or ordered each use of force leading up to deadly force, all tactics used, and the warrantless entry into Plaintiff's curtilage and home.

12.     Defendant CITY OF SALINAS has provided Plaintiff certain records, interviews, photos and video recordings of this incident, but not any reports of any homicide or internal affairs investigations or of any review board of this incident.

13.     The true names and capacities of Defendants sued herein as DOES 1–20 ("DOE Defendants") are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names, and Plaintiff will seek leave to amend this Complaint to show their true names and capacities when the same are ascertained.  Each DOE Defendant was an employee/agent of the CITY OF SALINAS and the SPD, and at all material times acted within the course and scope of that relationship.

14.     Plaintiff is informed and thereon allege that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff.  Further, one or

more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including DOE Defendants.

15.     Plaintiff is informed and believes, and thereon alleges, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other harm.  Each Defendant was an integral participant, and was fundamentally involved, in the events described herein, including seizing and using excessive force against Decedent, and violations of Plaintiff's and Decedent's rights.

16.     The acts and omissions of all Defendants as set forth herein were at all material times pursuant to the actual customs, policies, practices and procedures of the SPD.

17.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

18.     Plaintiff timely and properly filed a claim pursuant to California Government Code § 910 *et seq.*, and this action is timely filed within all applicable statutes of limitation.

19.     This Complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2).

**GENERAL ALLEGATIONS**

20.     Plaintiff ANA LORENA RODAS realleges each and every paragraph in this Complaint as if fully set forth here.

21.     On or about January 18, 2017, at about 2:28 a.m., Defendants LÓPEZ and DOMINICI fatally shot MARLON RODAS-SÁNCHEZ while he was in his own home at 646 Terrace Street, Salinas, California, 93905.  Defendant LÓPEZ fired about seven shots from his AR-

1   15 assault rifle at MARLON RODAS SÁNCHEZ; one shot hit him in the right thigh, and another

2   hit him in the abdomen.  As MARLON RODAS-SÁNCHEZ lay on the ground, harmless and

3   incapacitated, Defendant DOMINICI fired three shots from his .45 semi-automatic pistol; all three

4   rounds struck MARLON RODAS-SÁNCHEZ in the chest.

5       22.    MARLON RODAS-SÁNCHEZ was born in El Salvador on December 12, 2000, and

6   he was sixteen years old when he died on January 18, 2017.  According to the autopsy, at the time

7   he died he was only five feet, four inches tall, and he weighed only 102 pounds.

8       23.    The property at 646 Terrace Street consisted of a main house, a detached in-law

9   cottage separated by a patio, a shed, and a driveway.  There was also a covered porch in the rear of

10  the main house through which one must cross before entering the sliding-glass back door of the

11  main house.  The covered porch, and the patio area, were used for activities intimately associated

12  with the home, including cooking and relaxing on a sofa on the patio.  Encircling the entire property

13  was a high wooden fence, about six feet tall, which prevented a person on the sidewalk from seeing

14  inside the property.  The fence on the eastern side of the property had a gated section, the same

15  height and material as the rest of the fence, which could be opened to allow a car to drive inside the

16  property.  As a matter of law and fact, the entire enclosed patio and driveway at 646 Terrace Street

17  was curtilage.

18      24.    MARLON RODAS-SÁNCHEZ paid rent to live in the main house at 646 Terrace

19  Street.  Carlos, Jose, and Nelson also lived in the main house.  In the detached in-law unit lived

20  Omar, his wife Jennifer, and their infant son Jonathan.  This detached in-law unit had a dead-bolted

21  front door.

22      25.    On January 17, 2017, at about 10:00 p.m., Carlos woke up to the sound of music and

23  light coming from the main house's bathroom.  Carlos went into the bathroom and saw MARLON

24  RODAS-SÁNCHEZ standing in the bathroom and listening to music playing on his cell phone.

25  Carlos saw a glass pipe, and he asked MARLON RODAS-SÁNCHEZ what he was doing with the

26  glass pipe.  MARLON RODAS-SÁNCHEZ did not respond; Carlos took the glass pipe, saw some

27

28

kind of white powder or residue on it, and broke it.  MARLON RODAS-SÁNCHEZ then layed down on the sofa in the living room, and Carlos went back to his room and fell asleep.

26.     On information and belief, MARLON RODAS-SÁNCHEZ had ingested a controlled substance and was experiencing a drug-induced psychiatric, emotional, and/or medical crisis, and may have been suffering from hallucinations, delusions, and paranoia.

27.     Later, at about 1:00 a.m., now January 18, 2017, Omar called Carlos on his cell phone.  Omar, who was in the detached in-law unit, told Carlos that someone was outside on the patio listening to music.  Carlos went out the sliding-glass back door, through the covered porch, and he saw MARLON RODAS-SÁNCHEZ standing in front of the detached in-law unit's front door, holding his cell phone and listening to music.  Carlos asked MARLON RODAS-SÁNCHEZ what he was doing there, and asked him to come back inside.  MARLON RODAS-SÁNCHEZ did not say anything or react in any way.  MARLON RODAS-SÁNCHEZ grabbed a 6" knife from the ground and started scraping it on the cement patio.

28.     Carlos went back inside the main house and decided to call 911 because he was concerned about MARLON RODAS-SÁNCHEZ.  Carlos thought that he was doing the right thing by calling the police, because he believed that the police are trained and know how to handle a boy having a possibly drug-induced psychiatric, emotional, and/or medical crisis.  Carlos worried about trying himself to handle MARLON RODAS-SÁNCHEZ, because if something went wrong, then Carlos might be held responsible.

29.     Carlos called 911 and told the dispatcher, on information and belief, that a sixteen-year-old boy who lived with him named MARLON RODAS-SÁNCHEZ was on drugs and was making noise.  Carlos specifically asked dispatch not to harm MARLON RODAS-SÁNCHEZ.

30.     At approximately 1:34 a.m., dispatch told SPD officers, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER, that in the 600 block of Terrace Street there was a "[California Welfare & Institutions Code §] 5150 male outside with a knife, also H&S," with "H&S" a reference, on information and belief, to MARLON RODAS-SÁNCHEZ being under the influence of some substance.

31.     About five minutes after Carlos called 911, about sixteen SPD officers, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER, along with members of the City of Salinas Fire Department and at least one fire truck, arrived at 646 Terrace Street.  Approximately eight SPD officers set up a perimeter around 646 Terrace Street to ensure the safety of bystanders and officers on scene.

32.     On information and belief, all officers on scene, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER, were wearing body-cameras capturing audio and video, and these body-cameras remained on during the moments before and after the shooting of MARLON RODAS-SÁNCHEZ.

33.     One or more of the SPD officers knocked on the front door of 646 Terrace Street, and Carlos answered the door.  Carlos told them that he was the main tenant of the house.  One or more of the SPD officers told Carlos, Jose, and Nelson to leave the main house at 646 Terrace Street, which they did, going out the front door.  One or more of the SPD officers asked Carlos if there were any other people or weapons inside the main house at 646 Terrace Street.  Carlos responded that no one else was inside the main house, and that there were no weapons inside the main house.  Carlos also told one or more SPD officers that Omar, Jennifer, and their infant son Jonathan were all inside the detached in-law unit, with the door locked.  Carlos also again told one or more SPD officers MARLON RODAS-SÁNCHEZ's name; that he was a sixteen-year-old boy possibly on drugs or otherwise behaving strangely; that he was a tenant in the main house; and that he did not want the SPD officers to hurt MARLON RODAS-SÁNCHEZ.  On information and believe, all of this information was promptly conveyed to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER.

34.     At 1:50:55 a.m., Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER heard over the radio that the house at 646 Terrace Street was evacuated.  On information and belief, dispatch also called Omar on his phone and told him to lock the front door to the detached in-law unit (the small unit behind 646) and to "shelter" inside at the end of the detached in-law unit opposite the door, since MARLON RODAS-SÁNCHEZ was

1   standing near the door, which was the only entrance/exit to the detached in-law unit.  The family did

2   so.  Officers also evacuated the neighbors in the houses surrounding 646 Terrace Street.

3        35.     Shortly after arriving on scene, Defendants GONZALEZ, MITCHELL, DOMINICI,

4   LOPEZ, MEDRANO, and WARNER all knew that: (1) there were no persons or weapons inside

5   the main house at 646 Terrace Street; (2) the occupants of the detached in-law unit on the property

6   of 646 Terrace Street were safely inside their unit with the door locked; (3) MARLON RODAS-

7   SÁNCHEZ was a sixteen-year-old boy outside his own home, possibly under the influence of a

8   controlled substance and experiencing a drug-induced psychiatric, emotional, and/or medical crisis;

9   (4) at least eight SPD officers had established a perimeter to prevent MARLON RODAS-

10   SÁNCHEZ from escaping; and (5) people in the homes neighboring 646 Terrace Street had been

11   evacuated.

12        36.     MARLON RODAS-SÁNCHEZ was standing and leaning against the wall next to

13   the door to the detached in-law unit; he was wearing a red sweatshirt, black pants, and white shoes;

14   he was talking to himself, and he was holding a 6" kitchen knife which he intermittently scraped on

15   the ground.   Defendants LÓPEZ and GONZÁLEZ, and possibly other Defendant SPD officers,

16   stood by the partially-open gate at the fence line on the eastern side of the property; from this

17   vantage point, they could see MARLON RODAS-SÁNCHEZ standing next to the locked door to

18   detached in-law unit, about 25' diagonally and to the right from the officers.  Unidentified SPD

19   officers commanded, in Spanish and English, MARLON RODAS-SÁNCHEZ to drop the knife.

20   The boy did not respond or acknowledge their presence.

21        37.     One or more unidentified SPD officers asked the SPD fire department captain to

22   approve the SPD's use of a high-pressure firehose as a use of force, and the SPD fire department

23   captain so approved.  SPD officers on scene had used firehoses to resolve "stand-offs" in the past;

24   the plan was to blast MARLON RODAS-SÁNCHEZ with the high-pressure water, knocking him

25   down and forcing him to drop the knife, or causing MARLON RODAS-SÁNCHEZ to drop the

26   knife.  Defendant DOMINICI received 1-2 minutes of instruction in the use of the high-pressure

27   firehose, and he moved to the gate, now slightly opened.

28

COMPLAINT AND JURY DEMAND                                  8

38.     At this point, the SPD officers had been on scene for about forty minutes.  It was a cold night, about 40 degrees Fahrenheit.  Without any warning that Defendant DOMINICI was going to deploy force, Defendant DOMINICI blasted MARLON RODAS-SÁNCHEZ with high-pressure water from the firehose; as he did so for at least 15 seconds, MARLON RODAS-SÁNCHEZ ran away from the torrent of water, towards the right of the officers standing by the gate, and towards a corner of the fenced-in patio, where he hid.  The water from the fire-house further drenched the patio; the patio and property were already wet and muddy, with pools of water from recent rains.

39.     MARLON RODAS-SÁNCHEZ then emerged and moved out onto the patio and into the SPD officers' view.  MARLON RODAS-SÁNCHEZ, soaked from having been blasted by the firehose, took off his drenched sweatshirt and threw it on the ground.  Then, without any warning that intermediate force was about to be used, Defendant MEDRANO, who was standing to the left of the gate, on information and belief with Defendants GONZALEZ, MITCHELL, DOMINICI, LOPEZ, and WARNER, upon Sgt. WARNER's order, fired a 40 mm baton round at MARLON RODAS-SÁNCHEZ.  At this time, MARLON had made no threatening gestures or movements with the knife, and had not attempted to approach any officer.  MARLON had not committed any crime.  The 40 mm round hit MARLON RODAS-SÁNCHEZ, who then began to limp.  Moments later, MARLON RODAS- SÁNCHEZ began to scream in pain.  Then, MARLON RODAS-SÁNCHEZ walked through the covered patio, opened the sliding-glass door, and entered the main house -- his home.  On information and belief, about one and a half minutes had elapsed from Defendant DOMINICI's blasting of MARLON RODAS SÁNCHEZ with the firehose until MARLON RODAS SÁNCHEZ entered the main house through the sliding-glass back door, closing it behind him.  When MARLON retreated into his home and shut the door, all Defendants knew or should have known (based on multiple radio updates and information from other officers) that MARLON was now alone inside his evacuated house; officers had the perimeter of the house surrounded; MARLON had never threatened any person with the knife or any other weapon; MARLON had no criminal history whatsoever; MARLON had committed no current crime; and

MARLON was temporarily intoxicated on some drug that eventually would wear off – if officers allowed enough time for the drug to wear off.

40.     At this point, without a search warrant, arrest warrant, or any circumstances constituting an exigency that would obviate the need for a warrant, upon Defendant WARNER's order, SPD officers, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER, all crossed the threshold of the gate into the curtilage of 646 Terrace Street.

41.     Defendant WARNER walked across curtilage and the enclosed patio, and he opened the sliding-glass door, which connected the kitchen of the house with the enclosed patio. MARLON RODAS-SÁNCHEZ was standing in the kitchen, holding the knife, and he was in full view of the SPD officers, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER, who all stood on the curtilage outside the kitchen sliding door.  MARLON RODAS-SÁNCHEZ made no threatening gestures or movements with the knife, did not approach any officer, nor did he say anything at all to the SPD officers, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER.  Nevertheless, Defendant MITCHELL, without warning that the use of a high level of force would be imminent, fired a 40 mm baton round at MARLON RODAS-SÁNCHEZ.  MARLON RODAS-SÁNCHEZ did not react, and although he continued to hold the knife, he made no threatening gestures, did not approach any officer, and did not pose any immediate threat to anyone by standing while holding a knife in his empty home.  Upon Defendant WARNER's order, Defendant MITCHELL then fired two more 40 mm baton rounds, again without warning that he was about to deploy a serious, injurious level of force, hitting MARLON RODAS-SÁNCHEZ in the legs.  MARLON RODAS-SÁNCHEZ cried out in pain, and he walked further into his house, into the living room adjoining the kitchen.

42.     At this point, Defendants LÓPEZ, GONZÁLEZ, MITCHELL, DOMINICI, and WARNER were standing in the enclosed patio just outside the sliding-glass back door to the main house.  They could see into the kitchen, and they knew that MARLON RODAS-SÁNCHEZ was

standing in the adjoining living room.  A nearby open bedroom window provided a view into the living room, and Defendant MEDRANO, standing outside on the enclosed patio, could see MARLON RODAS-SÁNCHEZ standing in the living room, holding the knife.  Without giving any warning that he was about to use significant, intermediate force, Defendant MEDRANO fired his Taser in probe mode through the open window, hitting MARLON RODAS-SÁNCHEZ as he stood in the living room merely holding the knife.  MARLON RODAS-SÁNCHEZ screamed out, and he moved out of view.

43.     MARLON RODAS-SÁNCHEZ continued to stand in the living room, holding the knife and speaking unintelligibly.  At no point did MARLON RODAS-SÁNCHEZ ever hold the knife in a way – or make any movement – to threaten any of the SPD officers, including but not limited to Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER.

44.     At this point, on information and belief, about 3 minutes and 20 seconds had elapsed since Defendant MITCHELL fired his first 40 mm round into the house striking MARLON RODAS-SÁNCHEZ.  Defendant GONZÁLEZ, still standing outside the main house on the enclosed patio, positioned herself so that she had a clear shot of MARLON RODAS-SÁNCHEZ.  Without warning that she was about to use significant, intermediate force on MARLON RODAS-SÁNCHEZ, upon Defendant WARNER's order, Defendant GONZÁLEZ fired her Taser in probe mode through the window and into the house, striking MARLON RODAS-SÁNCHEZ as he stood in his living room and causing him to scream out in pain and fall onto his back.

45.     Defendant WARNER yelled out to Defendant GONZÁLEZ to "Keep your finger on the trigger!"  By keeping the Taser trigger depressed, Defendant GONZÁLEZ applied a continuing discharge of excruciatingly painful, disorienting, and incapacitating electricity into MARLON RODAS-SÁNCHEZ's body.  Upon Defendant WARNER's order, GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, and WARNER rushed into the house.  Defendant Defendant GONZÁLEZ rushed into the house through the sliding-glass door holding the Taser trigger depressed; Defendant LÓPEZ, armed with an AR-15 rifle, rushed in and got in front of Defendant

GONZÁLEZ.  Defendant MITCHELL, Taser drawn, followed behind, and behind him followed Defendant DOMINICI, with his .45 semi-automatic pistol drawn.  Defendant WARNER entered last holding a plexiglass shield to protect himself.

46.     Because Defendant DOMINICI had drenched MARLON RODAS-SÁNCHEZ with water from a high-pressure firehose, upon entering the house MARLON RODAS-SÁNCHEZ had tracked water onto the tile floor of the kitchen and living room, making the tile floor slippery.  On information and belief, Defendants GONZÁLEZ and LÓPEZ also tracked water onto the tile floor of the kitchen, making it slippery.

47.     As Defendant LÓPEZ ran across the slippery tile floor from the kitchen into the living room towards MARLON RODAS SÁNCHEZ, he slipped and fell onto his buttocks. MARLON was laying on the living room floor getting Tased and screaming in pain.  From video, MARLON RODAS SÁNCHEZ appears to have begun to sit up slightly.  Immediately upon falling, Defendant LÓPEZ, from a sitting position, and without giving any warning that he would use deadly force, fired seven rounds from AR-15 through his legs at MARLON RODAS-SÁNCHEZ; wounding MARLON RODAS-SÁNCHEZ with one of more of those rounds.  The other rounds went through the wall of the house, hitting vehicles parked outside, including SPD patrol vehicles. Defendant MITCHELL also fired his Taser at MARLON RODAS-SÁNCHEZ.

48.     At the time Defendant LÓPEZ's fired his last round from the AR-15 assault rifle, and while MARLON RODAS-SÁNCHEZ was already wounded and trying to turn away to retreat further from the officers, Defendant DOMINICI, without warning that he was about to use more deadly force, fired three .45 rounds, hitting MARLON RODAS-SÁNCHEZ with one of more of those rounds.  MARLON sustained at least five gunshot wounds including three to his chest, one in the right thigh and one in the abdomen.  MARLON also had five Taser barb wounds.  MARLON RODAS-SÁNCHEZ let go of the kitchen knife he had been holding.  Defendant WARNER ordered officers to handcuff MARLON, and they did.  Defendant GONZÁLEZ administered first aid, and she could feel MARLON RODAS-SÁNCHEZ breathing as she applied pressure to his wounds.

1  Fire and medical personnel entered, but some minutes later, after consulting with a doctor at

2  Natividad Medical Center, MARLON RODAS-SÁNCHEZ was pronounced dead at about 2:30 a.m.

3          49.     Decedent MARLON RODAS-SÁNCHEZ posed no significant or immediate threat

4  of death or serious bodily harm to Defendant SPD officers or others at the time he was shot.

5  Decedent MARLON RODAS-SÁNCHEZ had not made any movement or gesture under the

6  circumstances that a reasonable officer would perceive as posing an immediate threat of death or

7  serious injury to justify the use of deadly force.  He never attempted to stab or cut any officer.

8  Decedent MARLON RODAS-SÁNCHEZ never threatened anyone with the knife, either physically

9  or verbally.  Decedent MARLON RODAS-SÁNCHEZ had committed no crime.  At the first AR-15

10  gunshots, MARLON was laying on the floor, and upon the first illegal and excessive gunshots,

11  MARLON exercised his right of self-defense to turn away from the officer to try to retreat from the

12  unlawful force.  Defendants LÓPEZ and DOMINICI unlawfully seized and used excessive force

13  against MARLON RODAS-SÁNCHEZ, including but not limited to, firing multiple, deliberate

14  gunshots at Decedent MARLON RODAS-SÁNCHEZ without warning and without legal

15  justification, causing great pain and suffering to Decedent MARLON RODAS-SÁNCHEZ and

16  causing his death.  Under these circumstances, warnings before each use of deadly and non-deadly

17  force were feasible.  No Defendant ever gave any warning to Decedent MARLON RODAS-

18  SÁNCHEZ.

19          50.     Further, Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO,

20  WARNER, and DOES 1–20 knew that Decedent MARLON RODAS-SÁNCHEZ was emotionally

21  disturbed and/or mentally ill, and that he was unlikely to be able to understand or immediately

22  follow shouted commands.  Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ,

23  MEDRANO, WARNER and DOES 1–20 were each fundamentally involved, provided armed

24  backup, and were integral participants in the shooting of Decedent MARLON RODAS-SÁNCHEZ,

25  including the conduct and decisions in the minutes that led to the shooting, and including the

26  warrantless entry into Decedent MARLON RODAS-SÁNCHEZ's curtilage and home, with the

27  shared purpose to apprehend Decedent MARLON RODAS-SÁNCHEZ.

28

COMPLAINT AND JURY DEMAND                                                                          13

51.     Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 used unreasonable and excessive tactics and force to handle the situation with MARLON RODAS-SÁNCHEZ, including by failing to tactically move and position themselves to avoid unnecessarily placing themselves and each other in positions of potential risk; instead, Defendants placed themselves in positions of relative potential danger without tactical benefit, thereby increasing the risk to MARLON RODAS-SÁNCHEZ that they might choose to shoot their way out of a situation that they themselves had created.  Further, Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 failed to properly and reasonably assess the situation, including that MARLON RODAS-SÁNCHEZ was known to be mentally ill and/or emotionally disturbed due to ingestion of drugs; that MARLON RODAS-SÁNCHEZ was not a criminal and had committed no crime; that it was the middle of the night, with no one on the streets except the responding SPD officers; that the SPD officers had established a perimeter around the property at 646 Terrace Street so that MARLON RODAS-SÁNCHEZ could not escape; and that no person or weapon was inside the main house at 646 Terrace Street into which MARLON RODAS-SÁNCHEZ had entered.  Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 also failed to consider that MARLON RODAS SÁNCHEZ had made no threatening movements while holding the knife, and that mere possession of a knife does not justify the use of deadly force.  Defendants GONZALEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20 also failed to properly communicate with MARLON RODAS SÁNCHEZ, including using de-escalation communication techniques that they had been previously taught, and they failed to coordinate their conduct or formulate any reasonable plan to safely handle MARLON RODAS SÁNCHEZ; instead, each Defendant acted without a plan as to how to safely address the situation with MARLON RODAS SÁNCHEZ.  Further, Defendant WARNER—an SPD Sergeant and, on information and belief, the highest-ranking SPD officer on scene—and DOES 1–20, failed to properly lead and coordinate the conduct of the other Defendants at the scene according to training and generally accepted law enforcement standards for safely handling persons with mental and/or emotional

1   disturbance.  Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO,

2   WARNER, and DOES 1–20 failed to follow generally accepted law enforcement standards and

3   training for safely handling MARLON RODAS-SÁNCHEZ as a mentally ill and/or emotionally

4   disturbed person.

5         52.     Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO,

6   WARNER, and DOES 1–20 each had been trained, since their police academies, in generally

7   accepted law enforcement standards and de-escalation tactics for safely handling and apprehending

8   an armed, mentally and/or emotionally disturbed person.  Those generally accepted standards and

9   de-escalation tactics include: to request back-up; to request and/or wait for a supervisor to come to

10  the scene if possible; to have the supervisor (or if a supervisor is unavailable, then a lead officer)

11  take the lead in coordinating and communicating an appropriate plan by all officers; to contain the

12  mentally disturbed individual at a safe distance for officers, the individual, and others; to

13  communicate with the individual through a single officer; to speak calmly and in a non-threatening

14  manner with the individual to try to engage the individual in a dialog; to avoid threatening or

15  frightening the individual with unnecessary display or use of weapons; to avoid issuing conflicting

16  commands to the individual; to use time to communicate with the individual and to allow the

17  individual time to understand, de-escalate, and calm down; to avoid officers placing themselves in

18  zones of danger or in positions where officers cannot retreat if necessary; to avoid provoking the

19  individual with premature and/or unnecessary uses of force or aggressive tactics; and to avoid

20  officers creating the situation where deadly force is used; to remember that a person having a

21  mental health crises is not a criminal and that different tactics are necessary rather than resorting to

22  significant force against a mentally disturbed person. [1]

23  ───────────────

24  [1] *Deorle v. Rutherford*, 272 F.3d 1271, 1282-83 (9th Cir. 2001), *cert. denied*, 536 U.S. 958 (2002)
    ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly

25  force to subdue him, the governmental interest in using such force is diminished by the fact that the
    officers are confronted, not with a person who has committed a serious crime against others, but

26  with a mentally ill individual. We do not adopt a per se rule establishing two different
    classifications of suspects: mentally disabled persons and serious criminals. Instead, **we emphasize**

27  **that where it is or should be apparent to the officers that the individual involved is**
    **emotionally disturbed, that is a factor that must be considered in determining, under *Graham*,**

28

53.     Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20, acting as integral participants with each other, each violated their training and generally accepted law enforcement standards (described in the preceding paragraph) for handling an emotionally or mentally disturbed person, including by failing to formulate and follow an appropriate plan with appropriate leadership, failing to attempt to de-escalate the situation and MARLON with appropriate communication, failing to use the time they had to allow MARLON to calm down or wear off the effects of drugs he had ingested, failing to avoid issuing conflicting commands, unreasonably threatening MARLON with words and uses of force, failing to warn MARLON before each use of force, failing to seek a warrant before entering MARLON's curtilage and home when he was already fully contained and unable to threaten anyone in that empty house, using unreasonably provocative tactics by deploying multiple rounds of serious, injurious force against MARLON in the absence of any immediate threat, using unreasonably provocative tactics by placing themselves in a zone of danger – even when MARLON had only retreated from them, and by using deadly force out of panic and/or Defendants' unreasonable subjective fear while lacking any objectively reasonable belief that this small, 102 pound boy having an emotional/psychiatric crisis posed an immediate threat of death or serious injury to anyone under the circumstances.

54.     Defendants LÓPEZ and DOMINICI had feasible and prudent alternatives to deadly force, including not entering the main house at 646 Terrace Street.  Alternatively, Defendants LÓPEZ and DOMINICI, as well as Defendants GONZÁLEZ AND MITCHELL, unreasonably and unnecessarily placed themselves in a zone of potential danger without due care and in violation of their training and generally accepted law enforcement standards.

55.     Further, as a result of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 unreasonable, reckless, excessive, unlawful, and provocative tactics, each Defendant, individually and as an integral participant, created the situation where deadly force was used.

_____

**the reasonableness of the force employed."**).

56.     The unlawful and provocative tactics and collective use of force by Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 were totally unnecessary and unreasonable under the circumstances; caused the use of unnecessary and excessive deadly force; were conscience shocking; and were done without a legitimate law enforcement purpose.

57.     At all material times, and alternatively, the actions and omissions of each Defendant were intentional; wanton and/or willful; conscience shocking; reckless; malicious; deliberately indifferent to Decedent's and Plaintiff's rights; done with actual malice; grossly negligent; negligent; and objectively unreasonable.

58.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Plaintiff sustained the following injuries and damages, past and future, among others:

a.     Wrongful death of MARLON RODAS-SÁNCHEZ;

b.     Hospital and medical expenses (Survival claims) (Plaintiff ANA LORENA RODAS);

c.     Coroner's fees, funeral, and burial expenses (Survival claims) (Plaintiff ANA LORENA RODAS);

d.     Loss of familial relationships, including loss of love, companionship, comfort, affection, consortium, society, services, solace, and moral support (Plaintiff ANA LORENA RODAS based on wrongful death and loss of familial association);

e.     Loss of economic support (Plaintiff ANA LORENA RODAS, based on wrongful death and loss of familial association);

f.     MARLON RODAS-SÁNCHEZ's severe and painful physical injuries, pursuant to federal civil rights law (Survival claims) (Plaintiff ANA LORENA RODAS);

g.     MARLON RODAS-SÁNCHEZ's loss of life, pursuant to federal civil rights law (Survival claims) (Plaintiff ANA LORENA RODAS);

h.     MARLON RODAS-SÁNCHEZ's conscious pain and suffering, pursuant to federal civil rights law (Survival claims) (Plaintiff ANA LORENA RODAS);

i.     Violation of constitutional rights;

j.     Pain and Suffering, including emotional distress (Plaintiff ANA LORENA RODAS, based on individual § 1983 claim for loss of familial association);

k.  All damages, penalties, and attorneys' fees and costs recoverable under 42 U.S.C. §§ 1983, 1988, 12205; California Civil Code §§ 52, 52.1, California Code of Civil Procedure § 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

**COUNT ONE**
**—42 U.S.C. § 1983—**
**PLAINTIFF ANA LORENA RODAS AGAINST DEFENDANTS GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, AND DOES 1–20**

59.  Plaintiff ANA LORENA RODAS realleges each and every paragraph in this Complaint as if fully set forth here.

60.  By the actions and omissions described above, Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 violated 42 U.S.C. § 1983, depriving Plaintiff and/or Decedent MARLON RODAS-SÁNCHEZ of the following clearly established and well-settled constitutional rights protected by the First, Fourth and Fourteenth Amendments to U.S. Constitution:

a.  MARLON RODAS-SÁNCHEZ's right to be free from government entry of real property, curtilage, and home in the absence of a warrant, any exigency, or probable cause, as secured by the Fourth Amendment to the U.S. Constitution (Plaintiff's survival and wrongful death claims);

b.  MARLON RODAS-SÁNCHEZ's right to be free from unreasonable searches and seizures, including unlawful detention and arrest, as secured by the Fourth Amendment (Plaintiff's survival and wrongful death claims);

c.  MARLON RODAS-SÁNCHEZ's right to be free from excessive and unreasonable force in the course of arrest or detention as secured by the Fourth Amendment (Plaintiff's survival and wrongful death claims);

d.  MARLON RODAS-SÁNCHEZ's right to be free from the use of unlawful deadly force as secured by the Fourth Amendment (Plaintiff's survival and wrongful death claims);

61.  By the actions and omissions described above, Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 violated 42 U.S.C. § 1983, depriving Plaintiff ANA LORENA RODAS of the following clearly established and well-

settled constitutional rights protected by the First and the Fourteenth Amendments to the U.S. Constitution:

        a.    The right to be free from wrongful government interference with familial relationships, and Plaintiff's and MARLON RODAS-SÁNCHEZ's right to companionship, society and support of each other, as secured by the First and Fourteenth Amendments.

62.    Defendants subjected Plaintiff ANA LORENA RODAS and Decedent MARLON RODAS-SÁNCHEZ to their wrongful conduct, depriving them of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff ANA LORENA RODAS (individually and on behalf of MARLON RODAS SÁNCHEZ, Deceased) and others would be violated by their acts and/or omissions.

63.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff ANA LORENA RODAS sustained injuries and damages as set forth at ¶ 58, above.

64.    The conduct of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LÓPEZ, MEDRANO, WARNER, and DOES 1–20 entitles Plaintiff ANA LORENA RODAS to punitive damages and penalties allowable under 42 U.S.C. § 1983 and California law.  Plaintiff ANA LORENA RODAS does not seek punitive damages against Defendant CITY OF SALINAS.

65.    Plaintiff ANA LORENA RODAS is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and applicable federal and California codes and laws.

**COUNT TWO**
**—42 U.S.C. § 1983 (Municipal and Supervisory Liability)—**
**PLAINTIFF AGAINST DEFENDANTS CITY OF SALINAS,**
**CHIEF OF POLICE ADELE FRESÉ, AND DOES 1–20**

66.    Plaintiff ANA LORENA RODAS realleges each and every paragraph in this Complaint as if fully set forth here.

67.    The unconstitutional actions and/or omissions of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20, and other officers employed by or acting on behalf of Defendant CITY OF SALINAS, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of the SPD, stated in the

alternative, which were directed, encouraged, allowed, and/or ratified by policy making officers for the CITY OF SALINAS and the SPD, including but not limited to Defendant FRESÉ:

    a.    To use or tolerate the use of excessive and/or unjustified force when dealing with persons who are mentally and/or emotionally disturbed;

    b.    To use or tolerate the use of unlawful deadly force including permitting and affirmatively training officers (i) to use deadly force when faced with less than an immediate threat of death or serious bodily injury; (ii) to use deadly force prematurely, or as a "first resort," or when facing a mere potential threat; and (iii) to use deadly force without giving a proper warning when one would be feasible (iv) to use deadly force on a person merely holding a knife or other household tool with sharp edges;

    c.    To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning the de-escalation of encounters with mentally disturbed and/or intoxicated persons holding household tools with sharp edges;

    d.    To tolerate the use of a high-pressure firehose as a use of force against a mentally/emotionally disturbed person;

    e.    To fail to have any policies regarding the proper use of a high-pressure firehose as a use of force;

    f.    To fail to train and instruct officers regarding the lawful circumstances in which they may enter private property;

    g.    To cover-up violations of constitutional rights by any or all of the following:

        i.    by failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, unlawful seizures, and/or handling of mentally ill or emotionally disturbed persons;

        ii.    by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity; and

        iii.    by allowing, tolerating, and/or encouraging police officers to: fail to file complete and accurate police reports; file false police reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or unlawful police conduct, by withholding and/or concealing material information;

h.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and police department personnel, whereby an officer or member of the department does not provide adverse information against a fellow officer or member of the department;

i.    To use or tolerate inadequate, deficient, and/or improper procedures for handling, investigating, and reviewing complaints of officer misconduct made under California Government Code § 910 *et seq.*; and

j.    To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (i) above, with deliberate indifference to the rights and safety of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

68.    Defendants Chief FRESÉ, and DOES 1–20, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20, and other SPD personnel, with deliberate indifference to Plaintiff's and Decedent's constitutional rights, which were thereby violated as described above.

69.    Defendant FRESÉ and DOES 1–20 ratified and approved the unconstitutional actions and conduct of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20, and other SPD personnel, as described above.  Plaintiff ANA LORENA RODAS is informed and believes, and thereupon alleges, that the details of this incident have been revealed to Defendants FRESÉ, the CITY OF SALINAS, and DOES 1–20, and that they had direct knowledge of the fact that the killing of MARLON RODAS SÁNCHEZ was not justified, but represented an unconstitutional use of unreasonable, excessive, and deadly force. Notwithstanding this knowledge, Defendants FRESÉ, DOES 1–20, and authorized policymakers within Defendant CITY OF SALINAS, approved of the actions and/or omissions of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20 that resulted in the death of MARLON RODAS SÁNCHEZ, and they have made a deliberate choice to

endorse the actions of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20, and the bases for those actions, that resulted in the death of MARLON RODAS SÁNCHEZ.  By so doing, the authorized policy makers within the CITY OF SALINAS and the SPD, including Defendants FRESÉ and DOES 1–20, have shown affirmative agreement with the individual defendant officers' actions, and have ratified the unconstitutional acts of the individual defendant officers.

70.     The prior supervisory failures and deliberate indifference of Chief FRESÉ and DOES 1–20 were also a proximate cause of and moving force behind the violations of MARLON RODAS SÁNCHEZ's and Plaintiff's rights by Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20.  Defendants Chief FRESÉ and DOES 1–20 were responsible for creating, approving, and enforcing the unconstitutional customs and policies described in paragraph 67, above, that were a proximate cause and moving force of the individual Defendants' violations of rights and Plaintiff's and Decedent's injuries; (2) Chief FRESÉ and DOES 1–20 were responsible to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20, but due to their deliberate indifference to the substantial risk of harm to the public, including people situated like Plaintiff and Decedent, Chief FRESÉ and DOES 1–20 failed to reasonably, adequately, and appropriately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20; and (3) Chief FRESÉ, and DOES 1–20 ratified the Defendant officers' conduct and decisions in this matter as described in paragraph 69, above, after being fully informed of such and the basis for them, and after viewing the video of the shooting, thereby affirming Defendant officers' choices, unconstitutional decisions, and the bases for those unconstitutional decisions.

71.     The aforementioned customs, policies, practices and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; as well as the unconstitutional orders, approvals, ratification and toleration of wrongful conduct of Defendants FRESÉ, CITY OF SALINAS, and DOES 1–20; were a moving force and a proximate cause of the deprivations of Plaintiff's and MARLON RODAS SÁNCHEZ's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth in ¶¶ 60-61, above.

72.     Defendants subjected Plaintiff ANA LORENA RODAS and MARLON RODAS SÁNCHEZ to their wrongful conduct, depriving Plaintiff and MARLON RODAS SÁNCHEZ of rights described herein knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff ANA LORENA RODAS, MARLON RODAS SÁNCHEZ, and others would be violated by their acts and/or omissions.

73.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants CITY OF SALINAS, CHIEF FRESÉ, DOES 1–20, as described above, Plaintiff ANA LORENA RODAS sustained serious and permanent injuries and is entitled to damages, penalties, costs and attorneys' fees as set forth in ¶¶ 63-65, above, and punitive damages against CHIEF FRESÉ in her individual capacity.

**COUNT THREE**
**—VIOLATION OF CIVIL CODE §52.1—**
**PLAINTIFF AGAINST DEFENDANTS GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ,**
**MEDRANO, WARNER, AND DOES 1-20, AND CITY OF SALINAS**

74.     Plaintiff ANA LORENA RODAS realleges each and every paragraph in this Complaint as if fully set forth here.

75.     Plaintiff ANA LORENA RODAS brings this "Bane Act" claim individually for direct violation of her own rights, and as a survival claim pursuant to California Code of Civil Procedure § 377.20 *et seq.* for violation of MARLON RODAS SÁNCHEZ's and her own rights.

By their acts, omissions, customs, and policies, each Defendant, acting in concert/conspiracy as described above, interfered with, attempted to interfere with, and violated Plaintiff ANA LORENA RODAS's and MARLON RODAS SÁNCHEZ's rights under California Civil Code §52.1, and the following clearly established rights under the United States Constitution and the California Constitution:

    a.  MARLON RODAS SÁNCHEZ's right to be free from unreasonable searches and seizures as secured by the Fourth Amendment to the United States Constitution and by Article I, § 13 of the California Constitution (Survival claim only of Plaintiff ANA LORENA RODAS);

    b.  MARLON RODAS SÁNCHEZ's right to be free from excessive and unreasonable force in the course of arrest or detention, as secured by the Fourth Amendment to the United States Constitution and by Article 1, § 13 of the California Constitution (Survival claims only of Plaintiff ANA LORENA RODAS);

    c.  MARLON RODAS SÁNCHEZ's right to be free from the unreasonable use of deadly force as secured by the Fourth Amendment to the United States Constitution and by Article 1, § 13 of the California Constitution (Survival claim of Plaintiff ANA LORENA RODAS);

    d.  Plaintiff ANA LORENA RODAS' and MARLON RODAS SÁNCHEZ's right to be free from wrongful government interference with familial relationships, and Plaintiff's right to companionship and society with each other, as secured by the First and Fourteenth Amendments to the United States Constitution (Plaintiff ANA LORENA RODAS' individual claims); and

    e.  The right to protection from bodily restraint, harm, or personal insult, as secured by Cal. Civil Code § 43 (Plaintiff ANA LORENA RODAS' individual claim).

76.    Unlawful deadly force which violates the Fourth Amendment violates the Bane Act.[2] Defendants' use of unlawful deadly force against MARLON RODAS SÁNCHEZ, in and of itself, satisfies the "by threat, intimidation, or coercion" requirement of the Bane Act.

---

[2] *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. May 19, 2014) (citing *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013)).

77.     Further, all of Defendants' violations of duties and rights were volitional, intentional acts; none was accidental or merely negligent.  Any volitional, intentional violation of rights also satisfies the "by threat, intimidation, or coercion" requirement of the Bane Act.[3]

78.     Alternatively, Defendants violated Plaintiff ANA LORENA RODAS' and MARLON RODAS SÁNCHEZ's rights by the following conduct constituting threat, intimidation, or coercion that was above and beyond any lawful seizure or use of force:

    a.  Threatening MARLON RODAS SÁNCHEZ in the absence of any threat presented by MARLON RODAS SÁNCHEZ, or any justification whatsoever;

    b.  Using deliberately reckless and provocative tactics to apprehend MARLON RODAS SÁNCHEZ in violation of generally accepted law enforcement training and standards, and in violation of MARLON RODAS SÁNCHEZ's rights;

    c.  Pointing guns and causing officers to point guns at MARLON RODAS SÁNCHEZ, threatening the use of deadly force, without justification;

    d.  Threatening violence against MARLON RODAS SÁNCHEZ, with the apparent ability to carry out such threats, in violation of Civ. Code § 52.1(j);

    e.  Blasting MARLON RODAS SÁNCHEZ with a firehose, a use of force, without warning and without justification;

    f.  Shooting MARLON RODAS SÁNCHEZ with multiple 40 mm baton rounds, without warning and without justification;

    g.  Shooting MARLON RODAS SÁNCHEZ with a Taser, without warning and without justification;

    h.  Shooting MARLON RODAS SÁNCHEZ with an AR-15, without warning and without justification;

    i.  Shooting MARLON RODAS SÁNCHEZ with a .45 pistol, without warning and without justification, while he was already laying wounded on the ground;

    j.  Violating MARLON RODAS SÁNCHEZ's rights to be free from unlawful seizures by both wrongful arrest and excessive force;

---

[3] *Cornell v. City and County of San Francisco*, 17 Cal.App.5th 766, 801-02 (2017).

k.  Wrongfully entering MARLON RODAS SÁNCHEZ's curtilage and home without a warrant or lawful exigency;

l.  Causing and permitting the infliction of repeated applications of unnecessary force on MARLON RODAS SÁNCHEZ, by multiple officers, using multiple modalities of force, using force that was severe and/or deadly, over several minutes;

m.  Violating Plaintiff ANA LORENA RODAS' and MARLON RODAS SÁNCHEZ's rights to familial association by their use of conscience-shocking excessive force and provocative tactics without any legitimate law enforcement purpose.

79.   As a direct and proximate result of Defendants' violation of California Civil Code §52.1 and of Plaintiff ANA LORENA RODAS' and MARLON RODAS SÁNCHEZ's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 63-65, above, and punitive damages against Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20 in their individual capacities, including all damages allowed by California Civil Code §§ 52, 52.1 and California law, not limited to attorneys' fees, three times actual damages, and civil penalties.

80.   Defendant CITY OF SALINAS is vicariously liable, pursuant to California Government Code § 815.2, for the violation of rights by its employees and agents.

## COUNT FOUR
## —NEGLIGENCE; PERSONAL INJURIES—
## PLAINTIFF ANA LORENA RODAS AGAINST ALL DEFENDANTS

81.   Plaintiff ANA LORENA RODAS realleges each and every paragraph in this Complaint as if fully set forth here.

82.   At all times, each Defendant owed Plaintiff ANA LORENA RODAS and MARLON RODAS SÁNCHEZ the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

83.     At all times, each Defendant owed Plaintiff ANA LORENA RODAS and MARLON

RODAS SÁNCHEZ the duty to act with reasonable care.

84.     These general duties of reasonable and due care owed to Plaintiff ANA LORENA

RODAS and MARLON RODAS SÁNCHEZ by all Defendants include but are not limited to the

following specific obligations:

    a.     to refrain from using excessive and/or unreasonable force against MARLON RODAS SÁNCHEZ;

    b.     to refrain from unreasonably creating the situation where force, including but not limited to deadly force, is used;

    c.     to refrain from abusing their authority granted them by law;

    d.     to refrain from violating Plaintiff ANA LORENA RODAS' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

85.     Additionally, these general duties of reasonable care and due care owed to Plaintiff

ANA LORENA RODAS and MARLON RODAS SÁNCHEZ by Defendants CITY OF

SALINAS—acting through its responsible employees and agents including CHIEF FRESÉ and

DOES 1–20—as well as by CHIEF FRESÉ, and DOES 1–20, include but are not limited to the

following specific obligations:

    a.     to properly and adequately hire, investigate, train, supervise, monitor, evaluate, and discipline SPD officers under their supervision (including GONZÁLEZ, MTICHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20) to ensure that those employees/agents/officers act at all times in the public interest and in conformance with law;

    b.     to make, enforce, and at all times act in conformance with policies, training, and customs that are lawful and protective of individual rights, including those of Plaintiff ANA LORENA RODAS and MARLON RODAS SÁNCHEZ;

    c.     to refrain from making, enforcing, and/or tolerating the wrongful procedures, training, and customs set forth at ¶67, above.

86.     Defendants, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiff.  Defendant CITY OF SALINAS is vicariously liable pursuant to California Government Code § 815.2

87.     As a direct and proximate result of Defendants' negligence, Plaintiff and MARLON RODAS SÁNCHEZ sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 63-65, above, and to punitive damages against Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20.

**COUNT FIVE**
**—ASSAULT AND BATTERY—**
**PLAINTIFF ANA LORENA RODAS AGAINST DEFENDANTS GONZÁLEZ, MITCHELL,**
**DOMINICI, LOPEZ, MEDRANO, WARNER, DOES 1-20, AND THE CITY OF SALINAS**

88.     Plaintiff ANA LORENA RODAS realleges each and every paragraph in this Complaint as if fully set forth here.

89.     The actions and omissions of Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20 as set forth above constitute assault and battery. Defendant CITY OF SALINAS is vicariously liable pursuant to California Government Code § 815.2.

90.     As a direct and proximate result of Defendants' assault and battery of MARLON RODAS SÁNCHEZ, Plaintiff sustained injuries and damages, and is entitled to relief as set forth above at ¶¶ 63-65, above, and to punitive damages against Defendants GONZÁLEZ, MITCHELL, DOMINICI, LOPEZ, MEDRANO, WARNER, and DOES 1–20.

WHEREFORE, Plaintiff respectfully request the following relief against each and every Defendant herein, jointly and severally:

a.     compensatory and exemplary damages in an amount according to proof and which is fair, just and reasonable;

COMPLAINT AND JURY DEMAND                                                                          28

b.   punitive damages under 42 U.S.C. § 1983 and California law in an amount according to proof and which is fair, just, and reasonable (punitive damages are not sought against Defendant CITY OF SALINAS);

c.   all other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 USC §§ 1983, 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1, and as otherwise may be allowed by California and/or federal law;

d.   Injunctive relief, including but not limited to the following:

   i.   an order prohibiting Defendants from engaging in the unconstitutional or unlawful customs, policies, practices, procedures, training and supervision as may be determined and/or adjudged by this case;

   ii.   an order requiring Defendants to institute and enforce appropriate and lawful policies and procedures for the use of deadly force;

   iii.   an order prohibiting Defendants and their police officers from engaging in the "code of silence" as may be supported by the evidence in this case;

   iv.   an order requiring Defendants to train all SPD officers concerning generally accepted and proper tactics and procedures and this Court's orders concerning the issues raised in injunctive relief requests i-iii, above;

e.   declaratory relief;

f.   such other and further relief as this Court may deem appropriate.


DATED: January 10, 2018                    HADDAD & SHERWIN LLP


                                           /s/ Michael J. Haddad
                                           MICHAEL J. HADDAD
                                           Attorneys for Plaintiff

1

## **JURY DEMAND**

2

Plaintiff hereby requests a trial by jury.

3

4
DATED: January 10, 2018                   HADDAD & SHERWIN LLP

5

6                                          /s/ *Michael J. Haddad*_____

7                                          MICHAEL J. HADDAD
                                           Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28